In re Joseph R. FEHER and Barbara J. Feher, Debtors.

FORD MOTOR CREDIT COMPANY, Plaintiff,

v.

Joseph R. FEHER and James W. McRoberts, Defendants.

Bankruptcy No. 95–30444.
Adversary No. 96–3133.

United States Bankruptcy Court, S.D. Illinois.

Nov. 27, 1996.

Thomas J. Noonan, St. Louis, MO, for Plaintiff.

Michael Katz, Collinsville, IL, for Debtors.

James W. McRoberts, Belleville, IL, for Defendants.

## OPINION

KENNETH J. MEYERS, Bankruptcy Judge.

This case presents the question of how the Court should apportion the proceeds of a policy of automobile collision insurance, made jointly payable to a chapter thirteen debtor and to a creditor with a "crammed down" security interest in the insured automobile, upon destruction of the automobile after confirmation.

The facts are not in dispute. Several years prior to filing for relief under chapter

13, debtor Joseph Feher entered into a retail installment contract with Greenville Ford–Mercury, Inc., to finance the purchase of a 1991 Ford Escort. The contract was then assigned to Ford, which perfected a security interest in the automobile. As required by the retail installment contract, Mr. Feher obtained a policy of automobile insurance providing, among other things, collision coverage on the car. Ford was shown as the financing creditor on the policy declarations. The policy provided, in pertinent part:

> If a creditor is shown in the declarations, we may pay any ... collision loss to:
>
> . . . .
>
> you and such creditor, *as its interest may appear,* when we find it is not practical to repair your car. . . .

(Emphasis added).

Subsequently, on April 3, 1995, the debtors filed a petition for relief under chapter 13 of the Bankruptcy Code. Ford filed a proof of claim in the debtors' bankruptcy case asserting a claim of $4,442.02 secured by the 1991 Ford Escort. The debtors objected to the value placed on the car by Ford, due, in large part, to the fact that the car was not in driveable condition. Ford agreed at a hearing conducted on January 23, 1996, that the car's value was $100.00, and an order entered February 1, 1996, commemorated the parties' understanding that Ford would have a "crammed down" secured claim of $100.00, with the balance of its claim treated as unsecured. The debtors' fourth amended plan was confirmed on February 6, 1996. The plan provided, *inter alia,* that all property of the estate, other than the debtors' post-petition income, vested in the debtors upon confirmation and that secured creditors retained their liens until completion of the plan.

The automobile was subsequently destroyed. The insurance carrier declared the car to be a total loss and issued checks to the trustee for $4,424.63, representing the value of the car prior to its destruction. Ford has received payments through the plan sufficient to pay in full its "crammed down" claim.

Ford contends that as a beneficiary under the insurance policy, it has a contractual relationship with the insurer which stands unaffected by the determination of its secured claim during the bankruptcy proceedings and which requires that substantially all of the insurance proceeds be applied to reduce the balance of $4,342.02 still owed to it under the terms of the retail installment contract. Alternatively, Ford argues that if the Court determines the insurance proceeds do not belong to Ford, they should be paid into the bankruptcy estate for the benefit of the unsecured creditors.

In contrast, the trustee and the debtors argue that Ford is entitled to only those proceeds necessary to pay in full the value of its allowed secured claim. They reason that since the trustee, pursuant to the confirmation order and the order of February 1, 1996, has already paid Ford the full amount of its "crammed down" claim, Ford is entitled to receive nothing more on its secured claim. Further, they assert that the debtors, and not the unsecured creditors, are entitled to all of the insurance proceeds in order to purchase a replacement for the car which was destroyed.

■ To resolve this dispute, the Court must first decide whether the insurance proceeds are property of the debtors' bankruptcy estate. If so, ownership and apportionment of the proceeds are determined within the framework of the Bankruptcy Code. If not, ownership and apportionment are governed wholly by the terms of the contract of insurance.

The Bankruptcy Code defines property of the estate broadly. Section 541(a)(1) of the Bankruptcy Code provides that a debtor's estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The bankruptcy estate also includes "[p]roceeds ... of or from property of the estate," 11 U.S.C. § 541(a)(6), and "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). In chapter 13 cases, the

definition of estate property is broader still. The chapter 13 estate includes, in addition to the property specified in § 541, "all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first." 11 U.S.C. § 1306(a).

■ It is well established that a bankruptcy estate's ownership of a policy of insurance is not necessarily determinative of the ownership of proceeds of that policy. *E.g., First Fidelity Bank v. McAteer,* 985 F.2d 114, 117 (3rd Cir.1993); *In re Hill,* 174 B.R. 949, 951 (Bankr.S.D.Ohio 1994).[1] The Court agrees with those courts holding that the issue of insurance proceeds ownership "is dependent upon the nature of the policy and the specific provisions governing the parties' interests in the payment of policy proceeds." *In re Hill,* 174 B.R. at 952. Under this method of analysis, the Court examines the insurance policy itself to ascertain the type of insurance coverage, the beneficiaries named under the policy, and the extent of the benefits to be paid under the policy to each beneficiary. The policy's treatment of these factors determines whether the proceeds are, or are not, property of the bankruptcy estate.

In the instant case, Ford contends that its status as one of the beneficiaries under the policy of automobile insurance creates a contractual obligation on the part of the insurance company which may not be altered by the bankruptcy proceedings. According to Ford, its consent to the plan and to the "crammed down" value of its collateral has no bearing beyond the parameters of the bankruptcy case. Therefore, Ford contends, it is entitled to collect insurance proceeds from the third party insurer sufficient to retire the remaining balance of $4,342.02 due on the installment contract despite having

accepted a "crammed down" secured claim of $100.00 during the bankruptcy case.

In making this argument, Ford relies almost entirely on the decision of the Third Circuit Court of Appeals in *First Fidelity Bank v. McAteer,* 985 F.2d 114. However, its reliance on *McAteer* is misplaced. While the Court agrees with the Third Circuit's analysis in *McAteer,* finding it consistent with the decision reached here, the case is distinguishable from the instant case on its facts.

In *McAteer,* the Court of Appeals examined a credit life insurance policy which the debtor, Mr. McAteer, had purchased as security for an automobile loan extended to him by First Fidelity Bank. The policy named First Fidelity Bank as the primary beneficiary and Mr. McAteer's estate as the secondary beneficiary. In the event of Mr. McAteer's death, the policy provided that the insurance company would pay to the bank, as primary beneficiary, the full amount owed by Mr. McAteer to the bank according to the schedule of indebtedness, plus certain arrearages. Only if the death benefits paid under the policy exceeded the entire amount owed to the bank on the loan would the excess be paid to Mr. McAteer's estate as secondary beneficiary. *Id.* at 116.

After confirming a chapter 13 plan which "crammed down" the debt owed to the bank, Mr. McAteer died. A dispute then arose between decedent's estate and the bank over the amount of insurance proceeds which should be paid to the bank. Like the case at hand, the bank contended that it was entitled to insurance proceeds representing the balance due under the installment contract for the automobile. Decedent's estate countered that the bank was entitled to receive only those insurance proceeds which equaled the "crammed down" debt set forth in the confirmed plan.

---

1. Some courts have held that casualty insurance proceeds paid as a result of destruction of estate property simply replace estate property. *See, e.g., Bradt v. Woodlawn Auto Workers, F.C.U.,* 757 F.2d 512, 515 (2d Cir.1985) (insurance proceeds for repairs to a car are property of the estate because conversion in form of property does not change its character as property of the estate); *In re Arkell,* 165 B.R. 432, 435 (Bankr.M.D.Tenn. 1994); *In re Woods,* 97 B.R. 850, 851–52 (Bankr. W.D.Va.1989). This Court disagrees with such reasoning.

The Court of Appeals reviewed the credit life policy and concluded that the insurance policy, by its express terms, required the insurer to pay all proceeds to the bank as primary beneficiary until the amount remaining under the schedule of indebtedness was paid in full. *Id.* at 119. Decedent's estate, as secondary beneficiary, would not receive any benefits unless there were proceeds remaining after the debt to the bank was fully satisfied. *Id.* at 117. Under these facts, the Third Circuit held that the proceeds of the credit life insurance policy were not property of the bankruptcy estate, that the bank's interest in the proceeds could not be altered by the bankruptcy proceedings, *id.* at 118–19, and that decedent's estate would not be allowed to modify the insurance contract by paying the bank the smaller "crammed down" amount rather than the amount remaining under the schedule of indebtedness. *Id.* at 119.

The facts of the instant case, however, differ markedly from those in *McAteer.* Unlike the credit life benefits paid in *McAteer,* the collision benefits here flow directly from the destruction of bankruptcy estate property and, arguably, are a replacement of that property. *E.g., In re Arkell,* 165 B.R. 432, 435 (Bankr.M.D.Tenn.1994). More significantly, the policy at issue provides that collision loss benefits are payable jointly to Mr. Feher and to Ford, "as its interest may appear." Under the express terms of the contract of insurance, Ford is neither the primary nor the sole beneficiary of the proceeds. *See, e.g., In re Hill,* 174 B.R. at 953. Instead, the policy provisions give a shared interest in any proceeds to Mr. Feher and to Ford. *Id.* In a further departure from *McAteer,* where the policy defined what benefits the bank would receive, the policy here is silent with respect to the extent of each

beneficiary's interest in the proceeds, making it necessary to look outside the insurance contract to determine their respective interests. Thus, when Ford urges the Court to enforce its purported contractual right to receive full payment of the loan balance from the insurer, it is reading terms into the insurance policy which do not exist.[2]

In view of the fact that Mr. Feher has a shared interest in any proceeds paid under the policy, the proceeds constitute property of Mr. Feher's bankruptcy estate. *In re Hill,* 174 B.R. at 953; *In re Suter,* 181 B.R. 116, 119 n. 3 (Bankr.N.D.Ala.1994). Mr. Feher acquired an interest in the insurance proceeds after his chapter 13 case was commenced and before it was closed, dismissed, or converted. Therefore, the insurance proceeds are property of the bankruptcy estate. 11 U.S.C. § 1306(a)(1).

■ Having found that the insurance proceeds constitute property of the bankruptcy estate, the Court is left to determine the extent to which Ford's "interest may appear" in the shared proceeds. This determination must be made within the framework of the bankruptcy case since it involves the competing rights of the debtors and a secured creditor to bankruptcy estate property. *See, e.g., In re Hill,* 174 B.R. at 953.

■ Here, Ford's interest in the car is defined by the confirmed plan[3] and by the "cram down" agreement commemorated by the February 1, 1996, order. *See, e.g., In re Arkell,* 165 B.R. at 435. Both documents provide that Ford's interest in the car amounts to $100.00 and, under 11 U.S.C. §§ 506(a) and (d), Ford's lien is void to the extent it purports to secure an amount in excess of this value. *See, e.g., In re Suter,* 181 B.R. at 119. Since property insurance

---

**2.** Ford also analogizes the instant situation to that of a creditor who is entitled to enforce the entire indebtedness against a non-bankrupt co-debtor. However, the situations are readily distinguishable. A creditor has an independent contract with a co-debtor which contains terms allowing full collection of the debt when the bankrupt fails to pay. In contrast, the insurance contract at issue leaves open the question of

what interest, if any, Ford has in the proceeds. This question must be settled by reference to matters beyond the four corners of the insurance contract before Ford may enforce its rights against the insurer.

**3.** 11 U.S.C. § 1327(a).

serves as a substitute for the insured collateral, Ford's insurable interest in the car (and its interest in the proceeds) cannot exceed this amount, so long as the debtors perform under the plan. *See id.* at 120. The trustee already has paid Ford in full for its $100.00 "crammed down" claim through payments under the plan. Therefore, Ford has no interest remaining in the car (or in the insurance proceeds) to be satisfied under the plan. *See In re Stevens,* 187 B.R. 48, 50–51 (Bankr. S.D.Ga.1995); *In re Suter,* 181 B.R. at 119–20; *In re Hill,* 174 B.R. at 953; *Matter of McCauley,* 173 B.R. 453, 455 (Bankr.M.D.Ga. 1994); *In re Arkell,* 165 B.R. at 435; *In re McDade,* 148 B.R. 42, 44–45 (Bankr.S.D.Ill. 1992).[4]

■ Ford argues next that if the Court rules against it on the question of entitlement to the insurance proceeds, the proceeds should be returned to the bankruptcy estate for the benefit of the unsecured creditors rather than being paid to the debtors. Ford has not supported this argument with any authority, and the Court finds no merit in the argument because the car itself, and later the insurance proceeds, vested in the debtors free of the claims of creditors following confirmation and payment of Ford's "crammed down" secured claim, subject only to plan completion.

Section 1327(b) of the Bankruptcy Code states that "[e]xcept as otherwise provided in the plan or in the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor." 11 U.S.C. § 1327(b). This property vests "free and clear of any claim or interest of any creditor provided for by the plan" unless the plan or the confirmation order provides otherwise. 11 U.S.C. § 1327(c).

The debtors' plan was confirmed on February 6, 1996, and it provided, *inter alia,* that secured creditors would retain their liens until completion of the plan.[5] It further stated, in pertinent part:

> All property shall revest in the debtor upon confirmation except the debtor's post-petition income which shall not revest in the debtor(s) until such time as a discharge is granted or the case is dismissed. The debtor(s) shall have the right to the possession and use of all income not needed to fund this plan.

Thus, pursuant to §§ 1327(b) and (c) and the terms of the plan, the Ford Escort vested in the debtors upon confirmation, subject only to Ford's "crammed down" lien. That lien has been paid in full through payments under the plan. The unsecured creditors, on the other hand, have no interest in the car whatsoever. They are entitled to no more than the payments set forth in the plan and have no claim to the insurance proceeds. *In re Habtemichael,* 190 B.R. 871, 873 (Bankr. W.D.Mo.1996); *Matter of McCauley,* 173 B.R. at 455; *In re Pourtless,* 93 B.R. 23, 26 (Bankr.W.D.N.Y.1988); *In re Tucker,* 35 B.R. 35, 36–37 (Bankr.M.D.Tenn.1983). *Cf. In re Hill,* 174 B.R. at 951 n. 3, 953.

■ Ford also claims a perfected security interest in the insurance proceeds under 810 ILCS 5/9–306, which provides that a security interest in collateral continues in identifiable proceeds. Yet, even if the Court assumes for the sake of argument that Ford has a security interest in the insurance proceeds under Illinois law, the result is the same. The insurance proceeds, stemming from the destruction of the car after confirmation, vested in the debtors upon issuance, subject only to

---

**4.** The Court notes that § 502(j) of the Bankruptcy Code provides a procedure by which a creditor may, "for cause," and "according to the equities of the case," obtain reconsideration of a claim which has been allowed or disallowed previously. 11 U.S.C. § 502(j). However, Ford has not availed itself of this procedure.

**5.** Section 1325(a)(5)(B)(i) of the Bankruptcy Code also provides for lien retention. It states:
   (a) Except as provided in subsection (b), the court shall confirm a plan if—

   . . . .
   (5) with respect to each allowed secured claim provided for by the plan—
   . . . .
   (B)(i) the plan provides that the holder of such claim retain the lien securing such claim. . . .
11 U.S.C. § 1325(a)(5)(B)(i).

Ford's competing interest in the proceeds. However, Ford's interest was defined and limited by the extent of its secured interest in the collateral itself. Ford's secured interest in the car was "crammed down" to $100.00, and its lien in excess of $100.00 was voided. 11 U.S.C. §§ 506(a), (d). The voided portion of Ford's lien was not resurrected by the advent of the insurance proceeds. Moreover, Ford's "crammed down" claim was reduced to $0.00 by payments over time under the plan. Any interest Ford might have in the proceeds has been fully satisfied by plan payments totaling $100.00.

■ For the reasons stated, the Court finds that Ford's interest in the insurance proceeds is limited to the amount of its "crammed down" claim, and the debtors are entitled to the balance of the proceeds. This finding, however, is premised on the debtors' successful completion of their chapter 13 plan payments. If the debtors' chapter 13 case is dismissed prior to completion, all liens voided under § 506(d), including that of Ford, would be reinstated. *See* 11 U.S.C. § 349(b)(1)(C). The Court further finds, therefore, that Ford has an inchoate lien in the insurance proceeds pending the debtors' successful completion of their plan and discharge, in which case the inchoate lien would be extinguished.

Because of the eventuality that Ford's lien might be reinstated upon the dismissal of the case prior to completion of the plan, the trustee is directed to hold the insurance proceeds which are subject to Ford's inchoate lien until the plan is completed. The trustee may, however, allow the debtors to use the proceeds for the purchase of another vehicle, provided the debtors protect Ford's inchoate lien by giving it a consensual replacement lien subordinate to a new purchase money lien, if any.[6] Any such replacement lien shall be extinguished upon the debtors' successful completion of their plan and discharge.

---

**6.** The replacement lien shall be subordinate to a purchase money security interest perfected in the newly purchased property to the extent the amount advanced by the purchase money lender does not exceed the purchase price of the property minus $4,342.02.